UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) No. 2:18-CR-140 |
| | ) |
| ANDREW ASSAD, *et al.* | ) |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendants' Larry Everett Smith ("Smith"), Tanith Enterprises, LLC *d/b/a* Medvest Management Services ("Tanith"), and ULD Wholesale Group, LLC ("ULD"), (collectively the "Smith Defendants"), Joint Motion to Dismiss, [Doc. 126], the United States' Response, [Doc. 145], and the defendants' Joint Reply, [Doc. 154].

Defendants Andrew Assad ("Assad"), Peter Bolos ("Bolos"), Michael Palso ("Palso"), Synergy Pharmacy Services, Inc. ("Synergy"), and Precision Pharmacy Management LLC ("Precision"), (collectively the "Synergy Defendants"), have filed for leave to join and adopt the Joint Motion to Dismiss. [Docs. 127, 155].

In addition, the Court will consider, defendants' Germaine Pharmacy Inc. ("Germaine"), and ERX Consultants, LLC ("ERX"), Motion to Dismiss, [Doc. 130]. The matters are now ripe for review.

**I. Background**

The following synopsis summarizes the relevant allegations in the indictment that the government eventually must prove beyond a reasonable doubt.

Defendants are either pharmacists, pharmacies, wholesalers, or managers who operated pharmacies. The indictment alleges that beginning around June 2015 and continuing through in

1

or around April 2018, defendants knowingly and willfully engaged in a scheme to fraudulently bill Medicare, Medicaid, TRICARE, FECA, FEHBP, and private insurance carriers for in exchange for kickbacks and bribes. [Doc. 1 at ¶¶ 32, 33]. According to the indictment, defendants executed the conspiracy by scheming with a telemedicine company[1] to deceive doctors to prescribe certain medications that the defendant pharmacies found to be the most profitable. [*Id.* at ¶¶ 32, 34-38]. The telemedicine company orchestrated the fraud by allegedly selling these prescriptions with profitable drugs to defendant pharmacies. [*Id.* at ¶¶ 34-38]. Afterwards, in submitting a claim of reimbursement to the patients' insurance companies through pharmacy benefit managers ("PBM"), the defendant pharmacies allegedly misrepresented their purchase price of the medications, suggesting it was close to the average whole price ("AWP"), when in reality, the purchase price was much lower. [*Id.* at ¶¶ 39-44]. Defendants profited from the misrepresentation and split the profit with the telemedicine company. [*Id.* at ¶¶ 45-66].

On October 9, 2018, defendants were charged by way of indictment with thirty-two separate counts: one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, twenty-nine counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of misbranding drugs in interstate commerce with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a), 353(b)(1), and 333(a)(2). [*Id.*]. Defendants now move to dismiss the indictment for failure to state an offense. [Docs. 126, 130].

---

[1] Healthright, LLC, not a defendant in this case, was a telemedicine company which schemed with the present defendants. [Doc. 1 at ¶¶ 10, 19]. Healthright and its owner, Scott Roix, were charged with various criminal offenses in this district. *See United States v. Scott Roix, and Healthright, LLC*, No. 2:18-cr-133 (E.D. Tenn.). They have pled guilty and are awaiting sentencing.

**II.     Analysis**

Pursuant to Rule 12 of the Federal Rule of Criminal Procedure, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies the motions which must be made before trial. Fed. R. Crim. P. 12(b)(3). Among these, a defendant may bring a motion to dismiss for "a defect in the indictment or information including . . . (v) failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The United States Supreme Court has held that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted). *See United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as [they] . . . fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling*, 418 U.S. at 117-18 (citations and internal quotations omitted). In other words, where the indictment "clearly track[s] the language of the statute," it sufficiently "contain[s] the elements of the offense." *Anderson*, 605 F.3d at 411. Where the charging language includes "the relevant time period and the specific event that triggered the charge," the defendant will "accordingly be able to adequately plead an acquittal or conviction in bar of any future prosecutions arising from the same offense." *Id.*

A Rule 12(b)(3)(B)(v) motion is appropriate only "when it raises questions of law rather than fact." *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009) (approving defendant making a Rule 12 motion that "raise[d] a purely legal question about whether the indictment stated an offense"); *see also, e.g., Universal Milk Bottle Serv. v. United States*, 188 F.2d 959, 962, 64 Ohio Law Abs. 186 (6th Cir. 1951) (holding a motion "claiming that [the indictment's] allegations are false and untrue" improper because "issues of fact" must "be tried by a jury"); *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) (holding a Rule 12 motion inappropriate if it requires the court to "invade the province of the ultimate finder of fact"). "[A] court cannot consider a factual challenge to an indictment purporting to show a defect consisting solely of insufficient evidence to prove a particular charge." *United States v. Hann*, 574 F. Supp. 2d 827, 830 (M.D. Tenn. 2008) (citation omitted). Accordingly, an indictment that is valid on its face may not be dismissed on the ground that it is based on inadequate or insufficient evidence. *United States v. Williams*, 504 U.S. 36, 54 (1992).

In this context, the Court must review the indictment's factual allegations as true and construe those allegations in a practical sense with all of the necessary implications. *United States v. Reed*, 77 F.3d 139, 140 n. 1 (6th Cir. 1996) (*en banc*). Defendants' burden in this context is, correspondingly, "a heavy" one. *United States v. Lamoureux*, 711 F.2d 745, 747 (6th Cir. 1983).

Defendants argue the indictment "is fatally flawed because it fails to allege facts that state a criminal offense." [Doc. 126 at 7]. Specifically, defendants assert that the indictment does not allege defendants' participation in a scheme to defraud, or an intent to defraud. Conversely, the government contends that the indictment fully tracks the relevant statutes, includes the relevant time periods, and each charge is substantiated by specific allegations that fairly inform defendants of the charges against which they must defend. [Doc. 145 at 3].

**A. Breach of PBM Provider Agreements Amounts to a Civil Breach of Contract**

When "the indictment charges a conspiracy: [i]t is well settled that [in] an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy." *United States v. Ogbazion* 2017 WL 1315813, at *22-23 (S.D. Ohio Apr. 10, 2017) (quoting *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992)). *See United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985). "To establish conspiracy to commit [health care] fraud under 18 U.S.C. § 1349, the government must demonstrate that 'two or more persons conspired, or agreed, to commit the crime of [health care fraud] and that the defendant knowingly and voluntarily joined the conspiracy.'" *Ogbazion*, 2017 WL 1315813, at *23 (quoting *United States v. Harrison*, 663 Fed. App'x. 460, 464 (6th Cir. 2016)). Further, the crime of health care fraud requires a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services, the defendants knowingly and willfully executed or attempted to execute this scheme or artifice to defraud, and defendants acted with intent to defraud. 18 U.S.C. § 1347.

Based on this authority, the offense of conspiracy to commit health care fraud charged in Count One of the indictment does not need to "'allege with technical precision all the elements essential to . . . the object of the conspiracy [(i.e., [health care] fraud)]." *Ogbazion*, 2017 WL 1315813, at *25-6 (quoting *Superior Growers*, 982 F.2d at 176). "Rather, the charge must detail the conspiracy." *Id.* at *26. In the present case, the indictment charges that:

> [f]rom on or about June 1, 2015 through on or about April 1, 2018 the defendants . . . . knowingly and willfully combined, conspired, and agreed to deceive tens of thousands of patients and more than 100 doctors located in the Eastern District of Tennessee and elsewhere for the purpose of executing a scheme and artifice to defraud health care benefit programs, and to obtain by means of

5

> false and fraudulent pretenses, representations, and promises approximately $174,202,105 owned by or under the custody or control of health care benefit programs, in connection with the delivery of and payment for health care benefit, items or services, and, in furtherance thereof, caused to be submitted not less than approximately $931,356, 936 in fraudulent claims for payment.

[Doc. 1 at ¶ 1]. Count One alleges as follows:

> Beginning on or about June 1, 2015 and continuing until on or about April 1, 2018, in the Eastern District of Tennessee and elsewhere the SYNERGY PRINCIPALS, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, ULD WHOLESALE, TANITH, Healthright, Scott Roix and other persons and entities known to the grand jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to execute and attempt to execute a scheme and artifice to defraud health care benefit programs and to obtain by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.
>
> . . .
>
> The object of the conspiracy was for the [defendants], Healthright, Scott Roix, and other persons and entities known to the grand jury, to defraud, and to obtain large sums of money from Medicare, Medicaid, TRICARE, FECA, FEHBP, and by the Private Carriers by submitting fraudulent claims for payment for prescriptions to the PBMs that paid claims on behalf of those health care benefit programs[.]

[*Id.* at ¶¶ 32-33]. Count One then provides forty-forty paragraphs setting forth the "manner and means" of the conspiracy, detailing the defendants' activities in prescription brokering, the routine reimbursement submissions of inflated medication pricing to PBMs, the preauthorization of unnecessary medication substitutions, the filling of prescriptions without a valid practitioner-patient relationship, the concealment of actual pharmacy ownership from PBMs, copay collection fraud as well as Healthright's deceptive business model, all of which the government argues

collectively amounts to conspiracy to commit health care fraud. [*Id.* at ¶¶ 34-78]. Count One includes specific facts alleging that defendants used their businesses to "formulate[] a plan and agreement that, among other things, included" all of the aforementioned conduct. [*Id.* at 14].

In challenging the validity of the indictment, defendants assert that it does not allege defendants' participation in a scheme to defraud, but that the conduct alleged is simply individual breaches of contract between the defendant pharmacies and the PBMs amounting to failures to fulfill civil obligations. Defendants argue that, instead, the allegations are few and inconsequential, and do not assert that they knowingly and willfully participated in an agreement to defraud health care benefit programs and private insurance carriers. Ultimately, defendants argue the indictment is bereft of allegations that they participated in an agreement to defraud. Instead, they contend the facts alleged in the indictment, "if taken as true, simply amount to alleged breaches of contract, not criminal conduct." [Doc. 126 at 2]; *See* [Doc. 130 at 4-7].

The government maintains that defendants' criminal activity may have arisen in the context of a contractual relationship. [Doc. 145 at 4-5]. However, the government argues the defendant pharmacies' conduct in regards to buying prescriptions in violation of applicable laws and concealing this fact from patients, laundering funds to make it appear as though they were collecting copays, and concealing from the defendants' ownership or control of their pharmacies to prolong defendant's ability to obtain reimbursements from the BPMs, goes to defendants' intent to defraud and is a factual question reserved for the jury. [*Id.* at 6-7]. Finally, the government avers that the indictment's references to specific contractual provisions with allegations that defendants breached such contracts, provide context to prove materiality of a scheme to defraud, and that even if there were no contracts in place, the alleged conduct would have constituted fraud. [*Id.* at 7].

The Court rejects defendants' claim that Count One fails to state the offense of conspiracy to commit health care fraud because the actions described only amount to a civil breach of contract, and not a crime. Defendants are correct that a breach of contract, in and of itself, does not constitute a criminal scheme to defraud. However, Count One of indictment alleges the defendant pharmacies in breaching the PBM provider agreements committed the crime of conspiracy to commit health care fraud. The indictment alleges defendants breached the PBM agreements by failing to notify PBMs of changes in pharmacy ownership, by undermining the usual and customary pricing, failing to disclose copay collection payments, and finally, by violating Florida state statutes. [Doc. 1 at ¶¶ 28-30].

      i.    *Failure to Collect Co-Payments*

The indictment alleges that the PBM provider agreements required pharmacies to collect copays. [*Id.* at ¶ 30(c)]. The indictment excerpts Sections 2.3 and 2.4(a) of a provider agreement requiring pharmacies to collect copayments and disallowing the waiver or discount of such payments. [*Id.*]. The excerpted PBM agreement warns pharmacies that failure to collect copayment is a material breach of the agreement and may result in the immediate termination. [*Id.*]. The defendants, in an effort to circumnavigate the copay collection requirement, employed a "scheme to launder money through a company called AlphaScrip Inc. ("AlphaScrip") to make it appear to the PBMs as though [defendant pharmacies] were collecting copays, when in fact, they routinely and systematically failed to do so." [*Id.* at ¶ 77]. The indictment further alleges the defendants "understood their false representations to the PBMs that they were collecting copays were material to the decisions by the PBMs not to terminate their pharmacies and to continue paying claims submitted by the [defendant] pharmacies." [*Id.* at ¶ 78].

8

Defendants argue that failure to collect co-payments from patients is a breach of a PBM provider agreement, but not illegal. [Doc. 126 at 8-10]. Defendants contend the patients' copays were not waived, but rather were paid for by another company called AlphaScrip through a copay card assistance program. [Doc. 126-1 at 6-13]. In using this company, defendants argue that there "is no federal statute making it a crime . . . to implement a co-pay card assistance program connected to private health care benefit programs." [*Id.* at 8-9].

The government maintains that defendants' copay collection argument is premised on a disputed factual allegation that is not appropriate for resolution in a motion to dismiss. [Doc. 145 at 12]. The government highlights that the indictment alleges that the copays were not properly paid and that defendants had engaged in fraud to deceive the PBMs into believing that they were paid. [*Id.*]. The government further argues that defendants, by disputing the facts regarding the nature and materiality of the alleged copay fraud, reveal that the matters in dispute are within the province of the jury. [*Id.*].

Defendants' argument fails to attack the facial validity of the indictment and instead challenges the government's substantive case. To the extent the allegations in the indictment describe misrepresentations about copayments amounting to a breach of contract is a question of fact. And whether more occurred here as part of a greater criminal scheme to defraud health care benefit programs, as the indictment alleges, "rest[s] on factual disputes left to the factfinder." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (citing *United States v. Stewart*, 744 F.3d 17, 22 (1st Cir. 2014)). The Court cannot credit defendants' view of the evidence and their assertions concerning the legality of utilizing the copay card assistance program "without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). *See* [Doc. 126-1]. Accordingly, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an

indictment's allegations. *United States v. Silvius*, No. 1:12CR172, 2012 WL 5878841, at *5-6 (N.D. Ohio Nov. 21, 2012).

      ii.      *Concealment of Pharmacy Ownership*

Defendants argue that the alleged concealment of a change of pharmacy ownership without notifying the PBMs, in direct violation of the PBM agreements, only alleges a civil breach of contract. As such, defendants argue the government has failed to allege sufficient facts to state a criminal offense. [Doc. 126 at 10].

The government maintains defendants' argument is premised on a disputed factual allegation that is not appropriate to a motion to dismiss. [Doc. 145 at 11]. More particularly, the government argues that the defendants' alleged concealment of the interest in pharmacies to deceive the PBMs is a disputed factual allegation. [*Id.* at 13]. Further, the government notes that defendants do not cite to a single case arguing that "there is no matter of law for the Court to resolve." [*Id.* at 12].

Defendants' argument is unavailing. If taken as true, the allegations amount to a breach of contract. However, the breach of contract alone may not be sufficient enough to be the basis of a criminal act, and the indictment does not allege the criminal charge is solely borne out of defendants' concealment of pharmacy ownership from the PBMs. Instead, the alleged subverting of the notification requirements regarding change of pharmacy ownership is described as part of the manner of means for carrying out defendants' alleged criminal plan. [Doc. 1 at ¶¶ 67-73]. The purpose of the government's inclusion of alleged omissions is to provide distinct evidence of a "scheme" to defraud health care benefit programs. The indictment not only details and presents evidence of ownership concealment, but also of other various methods defendants used to accomplish their plan. *See Ogbazion*, 2017 WL 1315813, at *26 ("[T]he charge must detail the

conspiracy."). While the omissions alone would not be sufficient to constitute a scheme to defraud and support a charge of conspiracy to commit health care fraud, the indictment is not even primarily based on this omission. The indictment as written is sufficient to allege a scheme as evidenced from material facts and others detailed in the "manner and means" section. The burden remains on the government to prove the allegation of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 beyond a reasonable doubt.

    iii.    *Reference to Florida Statutes*

The indictment alleges "the PBM provider agreements required the pharmacies to comply with applicable laws, rules, and regulations." [Doc. 1 at ¶ 30(d)]. The indictment continues to list four Florida statutes[2] that applied to the defendant pharmacies, Synergy, Precision, Alpha-Omega and Germaine pharmacies. [*Id.*]. In describing the manner and means of the conspiracy, the indictment alleges defendant pharmacies entered in written "marketing agreements" with Healthright, which were actually agreements to purchase "prescriptions in violation of federal law and various state laws, including without limitation Fla. Stat. §§ 465.185 and 456.054(2)[3]. The PBMs would have terminated the conspiring pharmacies had they known that the prescriptions were purchased from HealthRight in violation of federal and state laws and regulations." [*Id.* at ¶ 38].

Defendants argue the indictment is laced with allegations regarding Florida state statutes, and this Court has no jurisdiction over alleged criminal acts under Florida law. [Doc. 126 at 3].

---

[2] The indictment cities Florida Statutes §§ 817.234(7)(a), 456.054(2), 465,185(1), 465.23(1)(h), 465.016(1). [Doc. 1 at ¶ 30(d)(i)].

[3] Florida Statue § 465.185 states that "[i]t is unlawful for any person to pay or receive any commission, bonus, kickback, or rebate or engage in any split-fee arrangement in any form whatsoever with any physician, surgeon, organization, agency, or person, either directly or indirectly, for patients referred to a pharmacy registered under this chapter." Florida Statue § 456.054(2) makes it "unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients."

Defendants further argue that "the Government disregards its jurisdictional limitations and improperly requests that violations of Florida state law should be the barometer to adjudicate a breach of PBM contract, which in turn the Government says is criminal." [*Id.*]. Defendants assert that, to the extent that the government claims defendants failed to comply with applicable laws, rules and regulations, the government is, "at best, alleging a breach of the PBM agreements." [*Id.* at 10]. As such, defendants maintain this Court has no jurisdiction to consider purported violations of Florida law. [*Id.* at 11].

The government contends the inclusion of Florida statutes in the indictment demonstrates circumstantial evidence of material fraud. [Doc. 145 at 9-11]. More particularly, the Florida statutes and their respective alleged violations serve to circumstantially prove defendants' knowledge, motive or intent that they were completely immersed in legal and regulatory reminders of the difference between appropriate and inappropriate conduct within the pharmacy industry. [*Id.* at 9]. The government maintains that "the existence of these statutes and regulations is evidence that defendants *knowingly intended* to defraud, especially since defendants owned and operated licensed pharmacies and at least one is a licensed pharmacist." [*Id.* at 11].

A straightforward reading of the indictment rebuts defendants' argument; the fact that the indictment references Florida state statutes does not affect the validity of the indictment. The indictment describes defendants' conduct, and does not charge defendants with violating the state statutes. The indictment clearly informs the defendants of the precise offenses of which they are accused with copious facts which adequately apprise the defendants of the nature of the charges against them. *See Russell v. United States*, 362 U.S. 749, 763-64 (1962). The state statutes are included as part of the general allegations and mentioned in less detail in the manner and means section, which provides evidence of defendants' alleged criminal plan to commit health care fraud.

*See* [Doc. 1 at ¶¶ 30(d)(i), 38]. Contrary to the defendants' assertion, the indictment does not request "this Court to improperly adjudicate violations of Florida State law under the guise of a breach of the PBM agreements[.]" [Doc. 126 at 10]. Instead, the indictment highlights and provides evidence of how the defendant pharmacies allegedly breached the PBM agreements' requirement to comply with both local and federal laws. As with the alleged pharmacy ownership concealment, this alleged breach serves as a piece of evidence of a greater alleged criminal "scheme."

In the present case, the indictment as to Count One adequately alleges that defendants knowingly conspired and agreed to commit the offense of health care fraud. As noted above, the indictment "specifies the timeframe of the conspiracy, the objective of the scheme, and the manner and means by which the scheme was accomplished." *Ogbazion*, 2017 WL 1315813, at *25. As such, the Court finds that Count One of the indictment contains the essential elements of the offense of conspiracy to commit health care fraud, the indictment is legally sufficient to give defendants notice of the charge against them, and the allegations set forth in the indictment are "sufficiently specific to plead double-jeopardy should [they] ever face the same charge, based on the same facts." *Id.* at *26.

### B. Practitioner-Patient Relationship

The indictment alleges defendants "interfered with the creation of a valid practitioner-patient relationship by submitting all or substantially all patient consults in electronic or 'e-consult' format as opposed to telephonic format." [Doc. 1 at ¶ 58]. The indictment continues stating that for approximately 95% of the prescriptions HealthRight allegedly sold to the defendants "the prescribing doctor never spoke with the patient." [*Id.*]. The indictment states that Health Right and defendants purposefully structured the patient consults in such manner because the defendants

"understood that if doctors were able to speak freely with patients, the doctors would be far less likely to issue prescriptions for" the pre-determined profitable medications. [*Id.*]. All while doing this, the indictment states that the Synergy defendants signed a document designated as a "doctor attestation," which stated that the doctors involved "maintain[ed] a valid prescriber-patient relationship[.]" [*Id.* at ¶ 59]. The "doctor attestation" was then appended "to thousands of the prescriptions . . . that HealthRight obtained through its care platform and sold to the [defendant pharmacies]." [*Id.* at ¶ 60].

Defendant Smith argues that the indictment is completely devoid of any facts demonstrating that Smith interfered with the creation of a valid practitioner-patient relationship. [Doc. 126 at 3]. Further, Smith contends that the government alleged without any factual basis that defendant, as a wholesaler, is not solely responsible for the creation of a valid practitioner-patient relationship. [*Id.*]. Smith argues the government has failed to allege facts demonstrating that he committed a criminal offense related with the alleged interference of the practitioner-patient relationship. He further argues that the government provides no factual information to show how he purportedly interfered with the practitioner-patient relationship. [*Id.* at 11].

The government first contends that whether a valid practitioner-patient relationship existed between the telemedicine company, doctors, and the patients is a question of fact reserved for the jury. [Doc. 145 at 14-16]. Second, the government emphasizes that the indictment alleges that all the defendants knew the prescriptions purchased from the telemedicine company were issued in the absence of a valid practitioner-patient relationship. [*Id.* at 14].

The Court cannot credit Smith's view that the indictment is bereft of factual information as to how he purportedly interfered with the practitioner-patient relationship. Although the indictment does not attribute the "doctor attestation" document's creation to Smith, or the Smith

defendants collectively, the indictment nevertheless alleges that the attestation was attached to every HealthRight prescription filled by the defendant pharmacies, including those filled by the Smith defendant pharmacies. [Doc. 1 at ¶¶ 60, 62]. *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) (Conspiracy may be shown by circumstantial evidence.); *United States v. Walls*, 293 F 3d 959, 967 (6th Cir. 2002) ("The connection between the defendant and the conspiracy need only be slight . . . ."). In regards of the extent the allegations in the indictment describe the absence of a valid practitioner-patient relationship, that is a "factual dispute[] left to the factfinder" and, thereby, is not appropriate for a Rule 12(b)(3)(v) motion to dismiss. *Ngige*, 780 F.3d at 502 (citation omitted).

### C. Inflated AWP & Money Laundering

First, defendants argue the government has failed to state a criminal offense in connection to inflated AWP medications. [Doc. 126 at 4]. Defendants argue that there was no way for defendants to "inflate" AWPs, because that figure is not based on actual transactional, market price data. [*Id.* at 12-13]. Defendants assert that purchasing "medicine at a price lower than the AWP and profiting as a result is (a) not illegal, and (b) does not actually constitute an 'inflation' of the AWP figure itself." [*Id.* at 14]. Instead, defendants maintain "this is common practice in the pharmaceutical industry." [*Id.*]. Finally, defendants argue there is nothing inherently criminal about trying to earn a profit.

Second, the defendants argue the indictment "digresses into uncharged bad acts, alleging several times" that defendants laundered money, but the government did not bring a money laundering charge against defendants. [*Id.* at 4, 15-17, Doc. 130 at 7-8]. Further, defendants contend that the government does not attempt to set forth the elements of money laundering, and it is not clear under which statute the government attempts to allege. [Doc. 126 at 17]. As such,

defendants argue that the indictment fails to state an offense of money laundering as a matter of law, and the Court should dismiss all allegations regarding money laundering against defendants. [*Id.*].

The government argues that the indictment contains no allegations that defendants inflated average wholesale prices, but that the defendants used the inflated AWP concept to ensure that the conspiracy was profitable. [Doc. 145 at 16]. Further, the government argues that this Court has already reviewed and rejected this argument in the Magistrate Judge's order denying defendants' joint motion to strike surplusage in the indictment, and is not germane to this motion. [*Id.* at 17]; *see* [Doc. 133]. The government argues that the indictment does not charge defendants with money laundering, and that this argument has been previously reviewed by the Court in the Magistrate Judge's Order denying defendants' joint motion to strike surplusage in the indictment. [Doc. 145 at 17]; *see* [Doc. 133]. Accordingly, the government contends that defendants have not presented any new argument for the Court's consideration and the outcome should be the same. [Doc. 145 at 17].

As the government notes, defendants have previously raised these identical issues in their Joint Motion to Strike Surplusage in the Indictment, [Doc. 104]. The Magistrate Judge issued a memorandum opinion and order ruling on the motion, [Doc. 133], and the defendants subsequently appealed the Magistrate Judge decision, [Docs. 140, 142]. During the July 15, 2019 hearing on the motions, the Court noted that these arguments would be better suited to a motion in limine at a later date. As such, the Court will not substantively engage in these arguments.

**III.     Conclusion**

For the foregoing reasons, the Court concludes defendants have failed to demonstrate that the indictment fails to state an offense. The motion of the Synergy Defendants for leave to join

and adopt the Smith Defendants' motion, [Docs. 127, 155], are **GRANTED**. Defendants' Joint Motion to Dismiss, [Doc. 126], is **DENIED**. Germaine and ERX's Motion to Dismiss, [Doc. 130], is also **DENIED**.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
