

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREW ASSAD, | ) |
| PETER BOLOS, | ) |
| MICHAEL PALSO, | ) |
| SYNERGY PHARMACY SERVICES INC., | ) No. __2:18-CR-140_____ |
| PRECISION PHARMACY MANAGEMENT LLC, | ) |
| LARRY EVERETT SMITH, | ) Judge: Greer_____ |
| ALPHA-OMEGA PHARMACY LLC, | ) |
| GERMAINE PHARMACY INC., | ) |
| ERX CONSULTANTS LLC | ) |
|     dba ZOETIC PHARMACY, | ) |
| TANITH ENTERPRISES LLC | ) |
|     dba MEDVEST MANAGEMENT SERVICES, | ) |
|         and | ) |
| ULD WHOLESALE GROUP LLC | ) |

## FIRST SUPERSEDING INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

### Introduction and Background

1.　　From on or about May 26, 2015 through on or about April 1, 2018, the defendants
ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, SYNERGY PHARMACY
SERVICES INC., PRECISION PHARMACY MANAGEMENT LLC, LARRY EVERETT
SMITH, ALPHA-OMEGA PHARMACY LLC, GERMAINE PHARMACY INC., ERX
CONSULTANTS LLC dba ZOETIC PHARMACY, TANITH  ENTERPRISES LLC, and ULD
WHOLESALE GROUP LLC, together with others not charged in this Indictment, including

1

Mihir Taneja, Arun Kapoor, Sterling-Knight Pharmaceuticals, LLC, Maikel Bolos, HealthRight LLC and Scott Roix (each of whom is a named defendant in a separate charging instrument), and other persons and entities known to the grand jury but not charged herein, knowingly and willfully combined, conspired, and agreed to deceive patients and doctors located in the Eastern District of Tennessee and elsewhere for the purpose of executing a scheme and artifice to defraud health care benefit programs, and to obtain by means of false and fraudulent pretenses, representations, and promises, approximately $174,202,105 owned by or under the custody or control of health care benefit programs, in connection with the delivery of and payment for health care benefits, items or services, and, in furtherance thereof, caused to be submitted not less than approximately $931,356,936 in fraudulent claims for payment.

**Persons and Related Entities**

2.      At all times relevant to this indictment, SYNERGY PHARMACY SERVICES INC. ("SYNERGY") was a corporation organized under the laws of the State of Florida and located at 31201 US HWY 19 N, Suite 2, Palm Harbor, FL 34684.  SYNERGY's national provider identifier ("NPI") was 1336455096 and its National Council for Prescription Drug Programs identification number ("NCPDP") was 5701594.  At all times relevant to this indictment, ANDREW ASSAD, PETER BOLOS, and MICHAEL PALSO (collectively, the "SYNERGY PRINCIPALS"), owned and controlled the business and operations of SYNERGY. At all times relevant to this indictment, SYNERGY was a pharmacy registered or required to be registered under Chapter 465 of Title XXXII of the Florida Statutes.

3.      At all times relevant to this Indictment, Maikel Bolos was a pharmacist licensed to practice by the State of Tennessee Department of Health, Division of Health Licensure and

2

Regulation, Office of Health Related Boards, Tennessee Board of Pharmacy (the "TN Board of Pharmacy"), license number 39073.

4.      On or about September 21, 2015, SYNERGY obtained Tennessee pharmacy license 00005657 from the TN Board of Pharmacy.

5.      At all times relevant to this indictment, ANDREW ASSAD was a pharmacist licensed (no. PS48738) to practice by the State of Florida. ANDREW ASSAD was never licensed to practice pharmacy by the TN Board of Pharmacy.

6.      On or about October 6, 2016, the SYNERGY PRINCIPALS organized PRECISION PHARMACY MANAGEMENT LLC under the laws of the State of Florida ("PRECISION"). At times relevant to this indictment, PRECISION was located at 31089 US Highway 19 North, Palm Harbor, Florida. At times relevant to this indictment, the SYNERGY PRINCIPALS: (a) owned and controlled the business and operations of PRECISION; and (b) used PRECISION to conceal their ownership of, and economic and controlling interests in, various pharmacies other than SYNERGY through which the SYNERGY PRINCIPALS billed prescriptions in furtherance of the conspiracy.

7.      On or about July 11, 2016, B.H. purchased ALPHA-OMEGA PHARMACY LLC, a company organized under the laws of the state of Florida ("ALPHA-OMEGA"). From the purchase date through the end of the conspiracy: (a) ALPHA-OMEGA was originally located in Largo, Florida and then moved to 4625 East Bay Drive, Suite 313, Clearwater, Florida; (b) ALPHA-OMEGA's NPI was 1770828741 and its NCPDP was 5712787; (c) except as otherwise specified, LARRY EVERETT SMITH ("LARRY SMITH") controlled the business and operations of ALPHA-OMEGA, even though it was legally owned by B.H.; and (d) ALPHA-OMEGA was a pharmacy registered or required to be registered under Chapter 465 of Title

3

XXXII of the Florida Statutes. On or about January 17, 2017, ALPHA-OMEGA obtained Tennessee pharmacy license 00005940 from the TN Board of Pharmacy.

8. On or about July 18, 2017, S.C. purchased GERMAINE PHARMACY INC., a corporation organized under the laws of the State of Florida ("GERMAINE"). From the date of purchase through the end of the conspiracy: (a) GERMAINE was located at 2511 West Swann Avenue, Suite 102, Tampa, Florida; (b) GERMAINE's NPI was 1376860866 and its NCPDP was 5705011; (c) LARRY SMITH controlled the business and operations of GERMAINE, even though it was legally owned by S.C.; and (d) GERMAINE was a pharmacy registered or required to be registered under Chapter 465 of Title XXXII of the Florida Statutes.

9. On or about July 18, 2017, K.C. purchased ERX CONSULTANTS LLC doing business as ZOETIC PHARMACY, a company organized under the laws of the State of Texas ("ZOETIC"). From the date of purchase through the end of the conspiracy: (a) ZOETIC was located at 10674 Westheimer Road, Houston, Texas; (b) ZOETIC's NPI was 1477922987 and its NCPDP was 5916878; and (c) LARRY SMITH controlled the business and operations of ZOETIC, even though it was legally owned by K.C.

10. At all times relevant to this indictment: (a) TANITH ENTERPRISES LLC doing business as MEDVEST MANAGEMENT SERVICES was a company organized under the laws of the State of Florida ("TANITH"); (b) LARRY SMITH owned and controlled the business and operations of TANITH; and (c) LARRY SMITH used TANITH and its employees to conceal his ownership of, economic and controlling interests in, ALPHA-OMEGA, GERMAINE, and ZOETIC.

11. From on or about June 2, 2015 through on or about September 1, 2016, ULD Wholesale Group Inc. was a corporation organized under the laws of the State of Louisiana. On

4

or about September 1, 2016, ULD Wholesale Group Inc. was administratively terminated by the State of Louisiana and then re-instated on or about March 10, 2017. On or about March 6, 2018, ULD Wholesale Group Inc. was converted into ULD WHOLESALE GROUP LLC, a limited liability company organized under the laws of the State of Florida. At all times relevant to this indictment: (a) LARRY SMITH owned and controlled the business and operations of ULD Wholesale Group Inc. and ULD WHOLESALE GROUP LLC ("ULD WHOLESALE"); and (b) LARRY SMITH used ULD WHOLESALE to purchase Inflated AWP Medications (as defined in paragraph 41) from Mihir Taneja, Arun Kapoor, and Sterling-Knight Pharmaceuticals, LLC for ALPHA-OMEGA, GERMAINE, and ZOETIC, and to launder money on behalf of ALPHA-OMEGA, GERMAINE, and ZOETIC, in each case in furtherance of the conspiracy as described herein.

12.     At all times relevant to this indictment, Mihir Taneja and Arun Kapoor controlled the business and operations of Sterling-Knight Pharmaceuticals, LLC ("Sterling-Knight"), a company organized under the laws of the State of Nevada, and operated Sterling-Knight as a "virtual manufacturer" of products purporting to be prescription drugs.

13.     On or about July 24, 2015, HealthRight LLC ("HealthRight") was organized under the laws of the State of Delaware. At all times relevant to this indictment, HealthRight had locations at 181 Washington Street, Suite 450, Conshohocken, Pennsylvania and 11515 66th Street North, Largo, Florida and elsewhere. At all times relevant to this indictment, Scott Gregory Roix ("Scott Roix") and H.S., substantially owned and controlled the business and operations of HealthRight.

**Telemedicine**

14.     Telemedicine provides a means of connecting patients to doctors through

electronic media, including through video-teleconference, telephone, or written electronic communications. Telemedicine facilitates prompt consultations between patients and doctors about non-urgent medical issues.

15.     The telemedicine relationship between patients and doctors is facilitated by telemedicine companies that charge a fee to patients to connect them to doctors for a prompt consultation. Telemedicine companies typically do not submit a claim for payment to a patient's insurance carrier.

16.     Telemedicine companies have contractual relationships with doctors – or contractual relationships with entities called *locum tenens* that, in turn, contract with doctors – pursuant to which the doctors agree to be available during pre-established times to consult telephonically with patients who pay the telemedicine company's fee.

17.     In practice, a patient with an ailment – for example, a sore throat – will contact his preferred telemedicine company and explain his symptoms. The telemedicine company will note the state in which the patient resides and send a notification, typically via email, text message, or phone call, to a participating contracted doctor who is licensed in the patient's state. When the doctor receives the notification, the doctor will contact the telemedicine company, which will in turn connect the doctor to the patient by telephone or video-teleconference.

18.     Telemedicine companies typically pay doctors a pre-determined fee for each patient consultation. The amount of the fee varies depending upon a number of factors. For example, telemedicine companies pay higher fees to doctors who conduct patient consultations by video-teleconference or telephone, but pay lower fees to doctors who conduct patient consultations via electronic written communication.

19.     A doctor consulting with a patient through a telemedicine company may decide to

issue a prescription for the patient's ailment. The telemedicine company may assist in transferring that prescription to the patient's preferred pharmacy; however, in ordinary telemedicine practice, the telemedicine company's fee is not contingent upon whether the doctor issues a prescription for a specific medication.

20.     If a patient receives a prescription through a telemedicine consultation, the patient is responsible for paying for the prescription. The patient could pay for the prescription in cash. Alternatively, if the patient is insured, the patient could provide his insurance information to the pharmacy. In turn, the pharmacy would submit a claim for payment for the prescription to the entity that adjudicates the claim on behalf of the patient's insurer (i.e., a pharmacy benefit manager, as described in paragraphs 29 and 30) and collect a copay from the patient prior to dispensing the medication.

21.     Telemedicine companies typically have no reason to obtain health and prescription insurance information from patients.

22.     From the date of its formation on July 24, 2015, through the end of the conspiracy, HealthRight purported to be a telemedicine company.

**Health Care Benefit Programs**

23.     At all times relevant to this indictment, the Medicare Program ("Medicare") was a federal program that provided health care benefit coverage to qualifying individuals. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b). Medicare was also a "federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

24.     At all times relevant to this indictment, TRICARE was a federal health insurance program for the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries world-wide, including active duty service members,

7

National Guard and Reserve members, retirees, their families, and survivors.  TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b).  TRICARE was also a "federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

25.     At all times relevant to this indictment, Medicaid was a health insurance program for low income and disabled individuals that was jointly funded by the federal and state governments.  For the purposes of this indictment, the following states had active Medicaid programs: Alaska, Arizona, California, Delaware, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Michigan, Minnesota, Nevada, New Mexico, New York, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Washington, and West Virginia (collectively, "Medicaid").  Medicaid was a "health care benefit program," as defined by 18 U.S.C. § 24(b).  Medicaid was also a "federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

26.     At all times relevant to this indictment, the Federal Employees' Contribution Act ("FECA") provided medical and health benefits (including prescription coverage) to federal civilian employees relating to disability due to personal injury sustained while in the performance of their official duties.  FECA was a "health care benefit program," as defined by 18 U.S.C. § 24(b).   FECA was also a "federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

27.     At all times relevant to this indictment, the Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items, and services to federal employees, retirees, and eligible spouses and dependents.  The United States Office of Personnel Management administered FEHBP and contracted with a number of private insurance carriers, including CareFirst Blue Cross/Blue Shield, to process and pay health care claims on behalf of the Office of Personnel Management.  FEHBP was a "health care benefit program," as defined

8

by 18 U.S.C. § 24(b).

28.     At all times relevant to this indictment, each of the hundreds of insurance companies, including without limitation Blue Cross Blue Shield of Tennessee, that paid the pharmacy benefit managers for prescriptions billed by the conspiring pharmacies for patients with private health insurance, as described in this indictment, was a "health care benefit program," as defined by 18 U.S.C. § 24(b) (collectively, the "Private Carriers").

## Pharmacy Benefit Managers

29.     At all times relevant to this indictment, Medicare, TRICARE, Medicaid, FECA, FEHBP, and the Private Carriers, described in paragraphs 23 through 28 did not process their beneficiaries' prescription claims directly.  Instead, each of them contracted with an entity called a pharmacy benefit manager ("PBM") that adjudicated claims for payments for prescriptions submitted by pharmacies, including SYNERGY, the PRECISION Pharmacies (as defined in paragraph 77), ALPHA-OMEGA, GERMAINE,  ZOETIC, and others in the conspiracy.

30.     At all times relevant to this indictment, CVS Caremark, Express Scripts, Optum, Prime Therapeutics, and other companies were PBMs that adjudicated prescription claims on behalf of Medicare, TRICARE, Medicaid, FECA, FEHBP, and the Private Carriers.

## PBM Provider Agreements and Provider Manuals

31.     PBMs and pharmacies entered into contractual arrangements called "provider agreements," which incorporate by reference "provider manuals" and other documents that specify the respective obligations of the PBMs and pharmacies (collectively, the "provider agreements").

32.     These provider agreements contained numerous provisions, including, without limitation, provisions regarding the manner and means by which pharmacies are required to

9

submit claims for payment to the PBMs, the method by which the PBMs calculate reimbursement amounts, the obligation of the pharmacies to collect patient copays, the obligation of the pharmacies to update ownership and control information, and the obligation of the pharmacies to comply with applicable federal and state laws and regulations.

33.     During the period of this indictment, SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, and ZOETIC were parties to provider agreements (directly or indirectly) with one or more PBMs.  These provider agreements contained numerous provisions, including, without limitation, the following:

(a)     *Notification in Change of Ownership* – During the time period of this indictment, the PBM provider agreements required the pharmacies to notify the PBMs of changes in ownership.  For example and without limitation, Section 1.2 of the Express Scripts provider manual stated: "Each [pharmacy] has an ongoing obligation to update PBM within five (5) business days of any changes to: Information previously submitted by [the pharmacy] as documented during the credentialing or re-credentialing process including, but not limited to, Ownership and Management information."  Similarly, Section 1.5 of the Express Scripts provider manual stated: "[The pharmacy] must immediately notify PBM in the event of a change of ownership or control."

(b)     *Prohibition on Undermining Usual & Customary Pricing.*  During the time period of this indictment, one or more of the PBM provider agreements prohibited the pharmacies from exploiting the manner in which the PBMs calculated payment amounts for prescriptions.  For example, Section 2.5 of the Express Scripts provider manual stated that the pharmacies "must not undermine U&C or other pricing.  This includes, but is not limited to . . . (ii) maintaining separate "insured" and "cash" formulations of compounds at different prices;

10

and (iii) implementing coupon or secondary payor programs funded by [the pharmacy], or by an affiliate of [the pharmacy]."

       (c)    *Copay Disclosure and Collection* – During the time period of this indictment, one or more of the PBM provider agreements required the pharmacies to collect copays.  For example and without limitation, Section 2.4a of the Express Scripts provider agreement required the pharmacies to "collect from Members the . . . applicable Copayment indicated by [Express Scripts]" and stated that "[c]opayments may not be waived or discounted." Section 2.3 of the Express Scripts provider manual also stated:

> Copayments are a critical benefit design tool that can sensitize Members to the cost of their medications and encourage Members to seek out less expensive medications that are equally as effective as more expensive medications. This in turn reduces costs to Sponsors and ultimately, to Members. Failure to collect Copayments, for example, may result in improper reimbursement to [the pharmacy] for medications that would not otherwise have been dispensed.

> and

> [The pharmacy] shall inform Members of the Copayment prior to dispensing each medication. In addition, [the pharmacy] must collect the Member Copayment. In general, the collection of the Copayment must occur prior to dispensing each medication. [The pharmacy] agrees that the routine failure to collect the full Copayment from Members undermines the Sponsor's benefit design in direct violation of the Provider Agreement, and accordingly it is reasonable to determine that such claims would not have been dispensed if the Copayment had been required. Failure to collect the Member Copayment is also a material breach of [the pharmacy's] obligations and may result in immediate termination. Because such medications likely would not have been dispensed if the Copayments had been correctly billed and collected from Members, [The pharmacy] understands that any claim for which [the pharmacy] cannot establish the collection of the Copayment may be subject to full recoupment by PBM, in its sole discretion.

       (d)    *Requirement to Comply with all Laws, Rules and Regulations* – During the

11

time period of this indictment, one or more of the PBM provider agreements required the pharmacies to comply with applicable laws, rules, and regulations. For example and without limitation, the Express Scripts provider manual stated:

> Section 2.7 – [The pharmacy] shall, and shall cause its personnel to, be bound by and comply with the provisions of this Agreement, and all applicable laws, rules and regulations including, but not limited to, fraud, waste and abuse laws and applicable state boards of pharmacy's, other applicable governmental bodies' laws, rules and regulations, and all required federal, state and local licenses, certificates and permits that are necessary to allow the [the pharmacy] and pharmacist (as applicable) to dispense Covered Medications to Members.

> and

> Section 4.2c – [Express Scripts] shall have the right to immediately terminate this Agreement . . . in the event that: . . . (vi) [Express Scripts] determines that [the pharmacy] is dispensing Covered Medications in violation of any applicable law, rule and/or regulation.

> and

> Section 6.4 – These prohibitions include . . . (ii) prohibitions on direct or indirect payment or compensation for Member prescriptions or referrals. It is [the pharmacy's] responsibility to be aware of all such laws and comply with all state and federal law, including anti-kickback statutes and self-referral statutes.

> and

> Section 6.5 – Failure to demonstrate compliance with these laws is a material breach of [the pharmacy's] obligations and may result in immediate termination by [Express Scripts].

        (i)      During the period of this indictment, the following laws, rules, and regulations among others set forth in this indictment and elsewhere applied to SYNERGY, some of the PRECISION Pharmacies, ALPHA-OMEGA, and GERMAINE:

<u>Fla.Stat. § 817.234(7)(a), which provided in relevant part:</u>

12

It shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge.

Fla.Stat. § 456.054(2), which provided in relevant part:

It is unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients.

Fla.Stat. § 465.185(1), which provided in relevant part:

It is unlawful for any person to pay or receive any commission, bonus, kickback, or rebate or engage in any split-fee arrangement in any form whatsoever with any physician, surgeon, organization, agency, or person, either directly or indirectly, for patients referred to a pharmacy registered under this chapter.

Fla.Stat. § 465.023(1)(h), which provided in relevant part:

The department or the board may revoke or suspend the permit of any pharmacy permittee, and may fine, place on probation, or otherwise discipline any pharmacy permittee if the permittee, or any affiliated person, partner, officer, director, or agent of the permittee . . . has . . . Dispensed any medicinal drug based upon a communication that purports to be a prescription . . . when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship that includes a documented patient evaluation, including history and a physical examination adequate to establish the diagnosis for which any drug is prescribed and any other requirement established by board rule under chapter 458, chapter 459, chapter 461, chapter 463, chapter 464, or chapter 466.

Fla.Stat. § 465.016(1), which provided in relevant part:

The following acts constitute grounds for denial of a license or disciplinary action, as specified in [Fla.Stat. § 456.072(2)]

13

(i) Compounding, dispensing, or distributing a legend drug, including any controlled substance, other than in the course of the professional practice of pharmacy. For purposes of this paragraph, it shall be legally presumed that the compounding, dispensing, or distributing of legend drugs in excessive or inappropriate quantities is not in the best interests of the patient and is not in the course of the professional practice of pharmacy . . .

(r) Violating any provision of this chapter or chapter 456, or any rules adopted pursuant thereto . . .

(s) Dispensing any medicinal drug based upon a communication that purports to be a prescription . . . when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship.

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1349)

34.     Paragraphs 1 through 33 are incorporated herein by reference and re-alleged as though fully set forth in the following count.

35.     Beginning on or about May 26, 2015 and continuing until on or about April 1, 2018, in the Eastern District of Tennessee and elsewhere, the SYNERGY PRINCIPALS, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, ULD WHOLESALE, TANITH, Sterling-Knight, Mihir Taneja, Arun Kapoor, Maikel Bolos, HealthRight, Scott Roix, and other persons and entities known to the grand jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to execute and attempt to execute a scheme and artifice to defraud health care benefit programs and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.

14

## OBJECTS OF THE CONSPIRACY

36.    The object of the conspiracy was for the SYNERGY PRINCIPALS, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, ULD WHOLESALE, TANITH, Sterling-Knight, Mihir Taneja, Arun Kapoor, Maikel Bolos, HealthRight, Scott Roix, and other persons and entities known to the grand jury, to defraud, and to obtain large sums of money from, Medicare, Medicaid, TRICARE, FECA, FEHBP, and the Private Carriers by submitting fraudulent claims for payment for prescriptions to the PBMs that paid claims on behalf of those health care benefit programs, as described below.

## MANNER AND MEANS

It was part of the conspiracy that the SYNERGY PRINCIPALS, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, ULD WHOLESALE, TANITH, Sterling-Knight, Mihir Taneja, Arun Kapoor, Maikel Bolos, HealthRight, Scott Roix, and other persons and entities known to the grand jury, formulated a plan and agreement that, among other things, included the following:

### Prescription Brokering

37.    Beginning on or about September 2015, the SYNERGY PRINCIPALS caused SYNERGY to enter into an agreement with HealthRight, pursuant to which HealthRight agreed to sell prescriptions to SYNERGY.  This agreement required HealthRight to deliver signed prescriptions for medications pre-selected by the SYNERGY PRINCIPALS based upon profitability, as described below, and required that every patient have health insurance with prescription coverage.

38.    Beginning on or about October 2016, the SYNERGY PRINCIPALS caused PRECISION to enter into an agreement with HealthRight, pursuant to which HealthRight agreed

15

to sell prescriptions to PRECISION. This agreement also required HealthRight to deliver signed prescriptions for medications pre-selected by the SYNERGY PRINCIPALS based upon profitability, as described below, and required that every patient have health insurance with prescription coverage.

39.     Beginning on or about December 2016, LARRY SMITH and Mihir Taneja caused ALPHA-OMEGA to enter into an agreement with HealthRight, pursuant to which HealthRight agreed to sell prescriptions to ALPHA-OMEGA. This agreement also required HealthRight to deliver signed prescriptions for medications pre-selected by LARRY SMITH and Mihir Taneja based upon profitability, as described below, and required that every patient have health insurance with prescription coverage.

40.     SYNERGY, PRECISION, ALPHA-OMEGA, GERMAINE, and ZOETIC, entered into written "Marketing Agreements" with HealthRight that disguised the true nature of their arrangement with HealthRight by making it appear as though the pharmacies and entities were purchasing *bona fide* marketing services from HealthRight instead of purchasing prescriptions in violation of federal law and various state laws, including without limitation Fla. Stat. §§ 465.185 and 456.054(2). The PBMs would have terminated the conspiring pharmacies had they known that the prescriptions were purchased from HealthRight in violation of federal and state laws and regulations.

### Inflated Average Wholesale Price Medication

41.     To ensure that the conspiracy was profitable, the SYNERGY PRINCIPALS and LARRY SMITH purchased dozens of products at prices substantially below the manufacturer-reported average wholesale prices ("AWP") of those medications, knowing that the PBMs relied on such manufacturer-reported AWPs in calculating how much to pay pharmacies (each an

16

"Inlated AWP Medication").  For example, they made the following purchases:

| Pharmacy | Purchase Date | National Drug Code | Drug | Unit Purchase Price | AWP | Markup |
|---|---|---|---|---|---|---|
| Synergy | 6/13/17 | 60846-0701-50 | Lidocaine 5% Ointment | $27 | $381 | 1,311% |
| Synergy | 10/11/17 | 27241-0032-03 | Omeprazole/SD Bicarb 40/1100mg 30 ct | $300 | $3,413 | 1,038% |
| Synergy | 8/4/17 | 00168-0844-01 | Diclofenac Sod Gel 3% | $129 | $1,179 | 812% |
| Synergy | 1/11/17 | 68462-0505-66 | Fluocinonide External Cream 0.1% | $382 | $2,336 | 511% |
| Synergy | 9/6/17 | 59088-0810-00 | DermacinRx Empricaine Kit 2.5% | $284 | $1,480 | 422% |
| Alpha-Omega | 8/31/17 | 69336-0310-30 | Cifrazol | $65 | $895 | 1,227% |
| Alpha-Omega | 9/28/17 | 65162-0911-74 | Diclofenac Sodium 1.5% | $80 | $690 | 763% |
| Alpha-Omega | 8/31/17 | 69336-0113-10 | Fenortho 200 mg Capsule, 100ct | $150 | $1,167 | 678% |
| Alpha-Omega | 7/11/17 | 69336-0300-30 | Durachol | $65 | $677 | 942% |
| Alpha-Omega | 12/29/16 | 69336-0826-01 | Lidopril XR | $400 | $1,896 | 374% |
| Alpha-Omega | 7/11/17 | 62250-0677-30 | Mefenamic Acid 250mg, 30ct | $95 | $522 | 449% |
| Alpha-Omega | 6/15/17 | 69336-0103-35 | Lidocaine 5% | $35 | $374 | 969% |

42.    The SYNERGY PRINCIPALS and LARRY SMITH purchased Inflated AWP Medications directly and indirectly from Mihir Taneja, Arun Kapoor, and Sterling-Knight, and from other wholesalers, suppliers, and manufacturers.

43.    The SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor knew that obtaining prescriptions for Inflated AWP Medications would make the conspiracy tremendously profitable because they understood how the PBMs' reimbursement methodology functioned.   In particular, the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor understood that the amount the PBMs would pay for a given medication would not exceed the lesser of: (a) the AWP reported by the manufacturer of that medication to data repository companies like Medispan; and (b) the "usual and customary price" (*i.e.*, the cash price for the same medication) reported by the pharmacy at the time the pharmacy billed the PBM for the medication.

44.    Mihir Taneja and Arun Kapoor used their knowledge of the PBM reimbursement methodology to identify and procure Inflated AWP Medications, assign them national drug codes, list them with companies like Medispan, and then sell them, directly and indirectly, to the

17

SYNERGY PRINCIPALS and LARRY SMITH and others involved in the conspiracy.

45.     Throughout the conspiracy, the SYNERGY PRINCIPALS routinely caused SYNERGY and the PRECISION Pharmacies, and LARRY SMITH routinely caused ALPHA-OMEGA, GERMAINE, and ZOETIC, to submit claims for payment to the PBMs in which they represented that their usual and customary price for Inflated AWP Medications was equal to the manufacturer-reported AWP of such Inflated AWP Medications. However, they actually purchased those Inflated AWP Medications at a small fraction of their reported AWPs, as indicated in the chart above.

46.     The purpose and effect of this was that the PBMs frequently paid SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, and ZOETIC amounts equal to or slightly less than the manufacturer-reported AWPs of the Inflated AWP Medications, even though the pharmacies: (a) purchased the Inflated AWP Medications at a small fraction of the publicly-reported AWPs; and (b) never or almost never sold the Inflated AWP Medications to cash-paying customers at the usual and customary prices they represented to the PBMs, and instead sold slightly altered formulations of the Inflated AWP Medications for a small fraction of the amounts billed for the Inflated AWP Medications, contrary to one or more provider agreements.

47.     To identify the most profitable Inflated AWP Medications, and to be certain that a given Inflated AWP Medication would adjudicate (that is, result in compensation and not be rejected by the PBMs), the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor "test billed" or "phished" (or caused others to do so) for the most profitable Inflated AWP Medications. They routinely submitted or caused to be submitted claims to the PBMs for this purpose, contrary to one or more provider agreements.

18

48.     To ensure that HealthRight obtained prescriptions for the Inflated AWP Medications, and not for other, less profitable medications, the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja created lists of Inflated AWP Medications, which they arranged in order of profitability or likelihood of adjudication.  They then caused these lists to be provided to HealthRight, which uploaded them into its care platform and took the steps described below to ensure that the prescribing doctors wrote prescriptions only for Inflated AWP Medications.  The SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja caused updated lists of Inflated AWP Medications to be provided to HealthRight whenever they identified more profitable medications or a PBM identified and blocked an Inflated AWP Medication.

### Non-Prescription Products Fraudulently Packaged as Prescription Drugs

49.     As part of the conspiracy, Mihir Taneja and Arun Kapoor purchased a variety of non-prescription products and fraudulently repackaged them as prescription drugs.  For example, Mihir Taneja and Arun Kapoor purchased millions of non-prescription capsules containing vitamin D and folic acid and fraudulently repackaged them as prescription drugs branded as "Durachol" and "Cifrazol", knowing that these capsules were not prescription drugs.

50.     Mihir Taneja and Arun Kapoor knew that the PBMs would pay substantially more for *prescription drugs* with national drug codes than for non-prescription vitamins, so they created fraudulent labels, package inserts, and sales sheets, assigned national drug codes to Durachol and Cifrazol, and told HealthRight and Scott Roix falsely that Durachol and Cifrazol were prescription products required to be taken under the supervision of a doctor.   Mihir Taneja and Arun Kapoor then caused the newly-branded Durachol and Cifrazol to be packaged and labeled with these fraudulent labels and inserts, thereby fraudulently branding them as

19

prescription drugs.

51.     Mihir Taneja and Arun Kapoor also made fraudulent submissions to the FDA on which they falsely stated that Durachol and Cifrazol were prescription drugs.

52.     Mihir Taneja and Arun Kapoor also made fraudulent submissions to Medispan on which they falsely stated that Durachol and Cifrazol were prescription products.

53.     Mihir Taneja and Arun Kapoor then sold tens of thousands of bottles of Durachol and Cifrazol to dozens of wholesalers and pharmacies, including LARRY SMITH and ULD WHOLESALE, knowing that LARRY SMITH would then cause pharmacies, including ALPHA-OMEGA, to bill for and dispense in interstate commerce these fraudulently-misbranded non-prescription vitamins as though they were prescription drugs.

## HealthRight's Care Platform

54.     Scott Roix utilized HealthRight's care platform to obtain doctor-authorized prescriptions for the highly profitable Inflated AWP Medications identified by the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja.

55.     The care platform consisted of three parts: (a) the HealthRight call center staff obtained each patient's insurance information ("phase I"); (b) next, a HealthRight employee masquerading as a practicing medical professional in rote fashion transcribed patients' answers to a pre-printed set of questions; then, HealthRight's care platform used the patients' insurance information to select the specific Inflated AWP Medication(s) to be prescribed as well as the pharmacy to fill the prescription, all before any information was presented to any doctor ("phase II"); and (c) then, HealthRight emailed or texted a doctor licensed in the patient's state and informed the doctor that an "e-consult" was ready for online review, in which HealthRight represented falsely that the patient had requested a prescription for a specific Inflated AWP

20

Medication– the doctor could then select that exact Inflated AWP Medication from a drop-down menu pre-populated into HealthRight's care platform with the ordered lists provided by the conspiring pharmacy selected in phase II ("phase III").

56.     In phase I, Scott Roix and HealthRight (to obtain prescriptions to sell to the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja) deceived patients into providing their health insurance information by: (a) placing fraudulent advertisements on various websites and social media outlets including without limitation Facebook and Yahoo!, indicating that HealthRight offered clinical research trials utilizing cannabidiol oil or CBD oil or other cannabis related medications; (b) placing fraudulent advertisements on various websites and social media outlets including without limitation Facebook and Yahoo!, indicating that HealthRight offered clinical stem cell research trials; (c) falsely informing patients that they would be notified of the amount of any copay, and have the opportunity to cancel their orders, before medications were mailed to them; (d) falsely informing patients that they would receive the medications as part of a free trial program; (e) falsely informing patients that they were not required to pay their copays; (f) falsely informing patients that the Inflated AWP Medications were very effective at treating various ailments; (g) deceiving patients about the specific Inflated AWP Medications that would be shipped to them; (h) intentionally withholding from patients the price of Inflated AWP Medications; (i) intentionally withholding from patients that the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja were paying HealthRight for each prescription; (j) using intentionally vague and misleading call scripts to induce patients to say "yes" to certain recorded questions; (k) ignoring patient requests to discuss prescriptions with the pharmacy or doctor prior to dispensing; and (l) engaging in numerous other deceptive techniques and practices.

57.     Also in phase I, as part of the conspiracy and at the direction of the SYNERGY

PRINCIPALS, LARRY SMITH, and Mihir Taneja, Scott Roix and HealthRight automatically

disqualified patients who did not have health insurance with prescription coverage because the

SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja knew they would be unable to

sell any Inflated AWP Medications to patients for cash – the entire conspiracy was intended to

defraud health care benefit programs represented by the PBMs.  Once the phase I caller

confirmed that the patient had health insurance with prescription coverage, the phase I caller

automatically waived HealthRight's standard patient consultation fee of approximately $55 for

every patient contacted by HealthRight about Inflated AWP Medications.  HealthRight did this

because Scott Roix and HealthRight knew that the patients would not agree to accept Inflated

AWP Medications if they were required to pay any fee to HealthRight.  As a result, kickbacks

(as described below) from the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja and

others known to the grand jury, were the only source of revenue to HealthRight for its role in the

conspiracy.  Through this fraudulent process, Scott Roix and HealthRight generated enormous

artificial demand for Inflated AWP Medications selected by the SYNERGY PRINCIPALS,

LARRY SMITH, and Mihir Taneja.

58.     In phase II, Scott Roix and HealthRight deceived patients into believing that they

were speaking with nurses or other trained clinical staff who were engaged in the practice of

medicine by, among other things, causing HealthRight staff members to tell the patients that they

were nurses or other trained medical staff when, in fact, HealthRight explicitly instructed all staff

members that they were not engaged in the practice of medicine.

59.     At the end of phase II, HealthRight's care platform selected the specific

conspiring pharmacy (*i.e.*, SYNERGY, a PRECISION Pharmacy, ALPHA-OMEGA,

GERMAINE, ZOETIC, or another conspiring pharmacy) that would fill the prescription based solely upon two factors: (a) the conspiring pharmacy had to have the ability to bill the designated PBM for that patient's prescription (*i.e.*, it could not have been terminated by that PBM for fraud, waste, or abuse, or for any other reason); and (b) the pharmacy was licensed to mail prescriptions to the patient's state.

60.     Once HealthRight selected the pharmacy, the selection of which Inflated AWP Medication would be prescribed followed automatically from the ordered lists of Inflated AWP Medications already provided to HealthRight by the selected conspiring pharmacy. This occurred because: (a) HealthRight's care platform deceived the prescribing doctor by explicitly telling him that the patient was interested in the first Inflated AWP Medication on the list provided by the selected conspiring pharmacy; and (b) HealthRight's care platform then presented prescription options in a drop-down menu that consisted only of Inflated AWP Medications selected from the ordered list already provided by the selected conspiring pharmacy. As a result, virtually all of the time HealthRight was able to steer doctors to prescribe the most profitable Inflated AWP Medication on the prescription list – that is, the Inflated AWP Medication preferred by the selected conspiring pharmacy.

61.     In phase III, after obtaining patient authorization using the misleading methods described above in phases I and II, Scott Roix and HealthRight deceived doctors to authorize fraudulent prescriptions for Inflated AWP Medications to patients. To accomplish this, Scott Roix and HealthRight employed a variety of techniques, including fraudulently leading doctors to believe that nurses were triaging patients before patient information was conveyed to doctors and that patients had requested specific Inflated AWP Medications by name or that patients had requested medications for supplemental therapies for scars, headaches, or general wellness and

23

engaged in numerous other deceptive techniques and practices.

62.     Having been deceived by the conspirators, doctors throughout the United States, including Dr. J.L. in the Eastern District of Tennessee, then issued tens of thousands of prescriptions for Inflated AWP Medications through HealthRight's care platform. As part of the conspiracy, HealthRight then sold these prescriptions to the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and others known to the grand jury.

### Pre-Authorized Substitutions for Other Inflated AWP Medications

63.     The SYNERGY PRINCIPALS and LARRY SMITH (and employees acting at their direction) then developed a "substitution cascade" to ensure that the pharmacies would be able to obtain compensation for each prescription for an Inflated AWP Medication. The substitution cascade was a list consisting of as many as 10 or more profitable alternatives to the highly-profitable Inflated AWP Medications that the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja needed HealthRight's doctors to prescribe. It often consisted of various combinations of the same ingredients used to make the primary Inflated AWP Medication. It began with the following language:

> In the event that the above formula or product is not covered by the patient's insurance, I approve one of the following formula(s) or product(s) as a substitute to be dispensed, in the following order:

64.     The Inflated AWP Medications on the substitution cascade were arranged by the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja in order of profitability and likelihood of adjudication. Thus, if a HealthRight doctor prescribed the primary Inflated AWP Medication *and* authorized substitutions, SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, and ZOETIC, could work their way down the substitution cascade until they were able to identify a profitable alterative that was covered by a given patient's health care

24

benefit program.

65.     The purpose and effect of the substitution cascade was to increase the profitability of the conspiracy by minimizing the need for the conspirators to consult doctors in the event that a PBM declined to accept a claim for payment for a given Inflated AWP Medication – a relatively frequent occurrence given that the PBMs were always attempting to identify and reduce fraud, waste, and abuse.

## Absence of Valid Practitioner-Patient Relationship

66.     As part of the scheme, Scott Roix and HealthRight, with the knowledge of the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja, submitted most patient consults to the prescribing doctors in electronic or "e-consult" format.  As a result, the prescribing doctors issued prescriptions for Inflated AWP Medications to thousands of patients whom they never met, never spoke to, and never received medical history information directly from, and with whom they had no pre-existing practitioner-patient relationship, no current practitioner-patient relationship, and had no ongoing or future practitioner-patient relationship.  The SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja knew that Scott Roix and HealthRight did this because they understood that if doctors were able to speak freely with patients, or had a valid practitioner-patient relationship with the patients, the doctors were unlikely to issue prescriptions for Inflated AWP Medications since the patients did not want the Inflated AWP Medications in the first place.

67.     Notwithstanding the SYNERGY PRINCIPALS' knowledge that most of the prescriptions were issued in the absence of a practitioner-patient relationship, the SYNERGY PRINCIPALS designed a document they called the "doctor attestation," which stated:

> I did maintain a valid prescriber-patient relationship with [this patient].

25

I maintain proper and valid licensure in [the patient's state].

I am aware of and my practice conforms with applicable [] state law with regards to licensure in general and specifically as it relates to the requirements of telemedicine.

I am aware of and my practice conforms with applicable [] state law as it relates to requirements for establishing a valid prescriber-patient relationship.

I deemed the following medication medically necessary for [the patient].

68. The SYNERGY PRINCIPALS then caused Scott Roix and HealthRight to append this doctor attestation to thousands of the prescriptions for Inflated AWP Medications that HealthRight obtained through its care platform and sold to the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja. The SYNERGY PRINCIPALS requested these fraudulent doctor attestations so that they could deceive the PBMs into believing that a valid practitioner-patient relationship existed for each prescription for Inflated AWP Medication, even though they knew or had reason to believe that the underlying prescriptions for Inflated AWP Medications were not based upon a valid practitioner-patient relationship, as required by applicable law and the provider agreements.

69. Subsequently, when the PBMs began to realize that the attestations were uniform in appearance across doctors, the SYNERGY PRINCIPALS requested that HealthRight alter the appearance of the attestations, by placing them on individualized doctor letterhead. HealthRight agreed and in fact made such alterations. The purpose of these alterations was to continue to deceive the PBMs into believing that a valid practitioner-patient relationship existed in connection with each prescription for an Inflated AWP Medication.

70. After obtaining signed prescriptions for Inflated AWP Medications, HealthRight

26

sold those prescriptions with attached phony attestations to the SYNERGY PRINCIPALS, LARRY SMITH, and Mihir Taneja and others known to the grand jury.

71.     At this point, HealthRight attempted to contact patients to inform them of the specific Inflated AWP Medication(s) prescribed by the doctor. During this call, HealthRight did not inform the patients whether the prescribing doctor had authorized the substitution of alternatives to the primary Inflated AWP Medication. The purpose and effect of this was that patients frequently received Inflated AWP Medications selected from the substitution cascade because those medications were more profitable to the conspiring pharmacies than was the primary Inflated AWP Medication; however, since neither HealthRight, the prescribing doctor, nor the pharmacies spoke to the patients about the contents of the substitution cascade, the patients had never been instructed on the proper use or application of such substitutions or even of the names of such medications. The further effect of this was that neither HealthRight nor any of the prescribing doctors had any record of which Inflated AWP Medications patients actually received.

72.     In the event that SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, or ZOETIC could not obtain compensation for a prescription for an Inflated AWP Medication or any item on the substitution cascade, the SYNERGY PRINCIPALS and LARRY SMITH simply caused their employees to request that HealthRight obtain a new prescription for a different Inflated AWP Medication. All of this was accomplished without informing the patients of the requested substitution or the reason for it.

73.     HealthRight took these requests and obtained new prescriptions for the newly-requested substitute Inflated AWP Medications and delivered them to the requesting pharmacy. The patients did not request, and were not aware of, the substitution. Similarly, if a conspiring

27

pharmacy was unable to obtain compensation for a prescription for an Inflated AWP Medication, HealthRight simply identified a similar Inflated AWP Medication available at another conspiring pharmacy, submitted a prescription request to a doctor for that similar Inflated AWP Medication, and then sold the resulting prescription to the other pharmacy. HealthRight did all of this without obtaining patient approval for the substitution or the change in pharmacy.

74. The PBMs would not have paid for these prescriptions for Inflated AWP Medications if they had known that they were obtained without a valid practitioner-patient relationship.

### Concealing Pharmacy Ownership from PBMs

75. As described in paragraph 33(a) above, the PBMs required that pharmacies notify the PBMs of changes in ownership or control. The SYNERGY PRINCIPALS and LARRY SMITH subverted these requirements by concealing their ownership of, or economic or controlling interests in, various pharmacies.

76. During the conspiracy, various PBMs terminated their contracts with SYNERGY and ALPHA-OMEGA due to fraud, waste, and abuse committed by those pharmacies. For example, and without limitation: (a) Prime Therapeutics terminated SYNERGY on or about February 17, 2016; (b) CVS Caremark notified SYNERGY that it was terminated on or about August 26, 2016; (c) Express Scripts terminated ALPHA-OMEGA on or about May 2017; (d) Navitus, another PBM, terminated ALPHA-OMEGA on or about July 6, 2017; and (e) Prime Therapeutics terminated ALPHA-OMEGA on or about September 29, 2017.

77. As a result of these terminations, the SYNERGY PRINCIPALS created PRECISION in October 2016 for the purpose of billing HealthRight prescriptions that SYNERGY could not bill (*e.g.*, prescriptions that were adjudicated by Prime Therapeutics and

28

CVS Caremark, to which SYNERGY could no longer submit bills), by re-directing those prescriptions through pharmacies in which the SYNERGY PRINCIPALS had concealed ownership, economic, or controlling interests, including pharmacies in Florida, Indiana, and Texas (each a "PRECISION Pharmacy" and, collectively, the "PRECISION Pharmacies").

78.     During the conspiracy, Maikel Bolos became a partial owner, and controlled some of the business and operations of, one of the PRECISION Pharmacies.  Maikel Bolos agreed to help the SYNERGY PRINCIPALS prolong the conspiracy by causing his PRECISION Pharmacy to bill for certain HealthRight prescriptions that SYNERGY could not bill because SYNERGY had been terminated by the PBM CVS Caremark.  Maikel Bolos then split the profit from billing these prescriptions with the SYNERGY PRINCIPALS.

79.     Similarly, on or about July 17, 2017, LARRY SMITH and Mihir Taneja installed trusted confederates as the nominal owners of GERMAINE and ZOETIC, but maintained control of the business and operations of both of those pharmacies through TANITH, which handled almost all of the business and operations of ALPHA-OMEGA, GERMAINE, and ZOETIC. LARRY SMITH and Mihir Taneja did this for the purpose of billing HealthRight prescriptions that ALPHA-OMEGA could not bill (*e.g.*, prescriptions that were adjudicated by Prime Therapeutics, Express Scripts, and Navitus), by re-directing those prescriptions through GERMAINE and ZOETIC.

80.     Prior to the conspiracy, LARRY SMITH owned a pharmacy in Florida ("Florida Pharmacy #1").  LARRY SMITH employed D.V. as the pharmacist in charge of "Florida Pharmacy #1.  In the early part of 2015, Express Scripts terminated Florida Pharmacy #1 for violations of their provider agreement.  As a result, LARRY SMITH concealed his and TANITH's ownership and control in ALPHA-OMEGA, and D.V.'s role as the pharmacist in

29

charge of ALPHA-OMEGA, from the outset of their involvement in the conspiracy that is the subject of this indictment. LARRY SMITH did this because he knew that the PBMs would not pay claims submitted by ALPHA-OMEGA if they became aware that he owned or controlled it or that D.V. was its pharmacist in charge. Mihir Taneja assisted LARRY SMITH with the concealment described in this paragraph.

81. The SYNERGY PRINCIPALS and LARRY SMITH concealed their involvement in these pharmacies to deceive the PBMs into paying for prescriptions that one or more of the PBMs would have denied had they known that: (a) the SYNERGY PRINCIPALS owned, controlled, or had economic interests in the PRECISION Pharmacies; (b) LARRY SMITH owned, controlled, or had economic interests in ALPHA-OMEGA, GERMAINE, and ZOETIC; or (c) D.V. was the pharmacist in charge of ALPHA-OMEGA and worked at TANITH for LARRY SMITH.

82. Scott Roix and HealthRight assisted the SYNERGY PRINCIPALS and LARRY SMITH in this subterfuge by helping to obtain prescriptions tailored to the PRECISION Pharmacies and GERMAINE and ZOETIC, when SYNERGY or ALPHA-OMEGA could not bill for them.

## Copay Collection Fraud

83. As described in paragraph 33(c) above, the PBMs required that SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, and ZOETIC collect copays from their patients. In practice, this meant that the pharmacies had to collect copayments from tens of thousands of patients whom HealthRight had deceived into providing prescription insurance information, almost all of whom didn't understand they were going to receive Inflated AWP Medications or didn't want them.

30

84.     The SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor understood that they could not collect copays from these deceived patients because the patients did not want the Inflated AWP Medications in the first place.  However, the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor also understood that if the PBMs audited SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, or ZOETIC, and discovered that they were not collecting the copays, then the PBMs would terminate the pharmacies thereby bringing an abrupt end to the conspiracy.

85.     Accordingly, the SYNERGY PRINCIPALS came up with a variety of schemes to launder money through several persons and companies (including Global Patient Services LLC and Affordable Medication Solutions LLC) to make it appear to the PBMs as though SYNERGY and the PRECISION Pharmacies were collecting copays when, in fact, they routinely and systematically failed to do so.  The SYNERGY PRINCIPALS also deceived the PBMs by changing patient names on copay receipts and by fraudulently altering patient copay statements and then submitting the fraudulent copay receipts and statements to the PBMs in connection with fraud, waste, and abuse audits conducted by the PBMs.

86.     Similarly, LARRY SMITH, Mihir Taneja, Arun Kapoor, and ULD WHOLESALE employed at least one scheme to launder money through a company called AlphaScrip Inc. to make it appear to the PBMs as though ALPHA-OMEGA, GERMAINE, and ZOETIC were collecting copays when, in fact, they routinely and systematically failed to do so.

87.     The SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor understood that their false representations to the PBMs that they were collecting the copays were material to the decisions by the PBMs not to terminate their pharmacies and to continue paying claims submitted by the pharmacies.  Had they not been deceived by the SYNERGY

31

PRINCIPALS, LARRY SMITH, Mihir Taneja, and Arun Kapoor, the PBMs would have denied claims for payment for patients who didn't pay copays and would have terminated SYNERGY, the PRECISION Pharmacies, ALPHA-OMEGA, GERMAINE, or ZOETIC had they known that those pharmacies routinely and systematically failed to collect copays.

### Fraudulently Obtained Pharmacy License

88.     The SYNERGY PRINCIPALS knew that they could not dispense medications from SYNERGY, which was located in Florida, to people in other states unless SYNERGY became licensed in those other states.

89.     To become licensed as a pharmacy in Tennessee, the TN Board of Pharmacy required out-of-state pharmacies like SYNERGY to submit a license application and to designate a Tennessee-licensed pharmacist-in-charge. For purposes of this indictment, the Tennessee-licensed pharmacist in charge was required by the TN Board of Pharmacy to be in actual attendance at SYNERGY at least 20 hours of each business week and to have supervision over the conduct of SYNERGY.

90.     ANDREW ASSAD was never a Tennessee-licensed pharmacist. However, the SYNERGY PRINCIPALS knew that Maikel Bolos was a Tennessee-licensed pharmacist. The SYNERGY PRINCIPALS paid Maikel Bolos in exchange for his agreement to permit the SYNERGY PRINCIPALS to claim falsely on SYNERGY's Tennessee pharmacy license application that Maikel Bolos had supervisory authority over the conduct of SYNERGY and was actually in attendance at SYNERGY at least 20 hours per week.

91.     As a result of the SYNERGY PRINCIPALS's and Maikel Bolos' false and fraudulent representations, the TN Board of Pharmacy issued SYNERGY a pharmacy license on or about September 21, 2015. Without this license, SYNERGY would not have been permitted

32

to dispense products to people located in Tennessee.

92. Had the TN Board of Pharmacy known that SYNERGY falsified its application paperwork, it would not have granted SYNERGY a license to dispense in Tennessee.

93. Had they known that the SYNERGY PRINCIPALS and Maikel Bolos obtained SYNERGY's Tennessee pharmacy license by fraud, the PBMs would not have paid SYNERGY for claims submitted for products SYNERGY dispensed to people in Tennessee or other states in which the SYNERGY PRINCIPALS obtained an out-of-state pharmacy license for SYNERGY by fraud.

94. During and in furtherance of the conspiracy, the SYNERGY PRINCIPALS and Maikel Bolos submitted similar fraudulent documents to the boards of pharmacy of various other States, including to the Louisiana board of pharmacy.

## OVERT ACTS

In furtherance of the conspiracy and to effect its unlawful objects, the following overt acts, among others, were committed by ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, ULD WHOLESALE, TANITH, Sterling-Knight, Mihir Taneja, Arun Kapoor, Maikel Bolos, HealthRight, Scott Roix, and other persons and entities known to the grand jury, in the Eastern District of Tennessee and elsewhere:

95. On or about May 26, 2015, Maikel Bolos and the SYNERGY PRINCIPALS assisted in the completion of, and caused to be sent from Florida to the TN Board of Pharmacy, a notarized Application for Pharmacy Business, and supporting documents, for SYNERGY to operate as a pharmacy in Tennessee, on which Maikel Bolos and the SYNERGY PRINCIPALS knowingly and intentionally caused to be made false and fraudulent representations and promises

33

under oath, including without limitation the false and fraudulent representations and promises under oath that Maikel Bolos had "supervision over the conduct of [SYNERGY]" and that he would "be in actual attendance at [SYNERGY] at least 20 hours of each business week."

96.     From on or after June 1, 2015, Scott Roix (and after July 24, 2015, HealthRight) caused electronic communications to be sent to patients and doctors throughout the United States, including hundreds of patients located in the Eastern District of Tennessee and at least one doctor located in the Eastern District of Tennessee, for the purpose of obtaining patients' insurance information and doctors' signatures on prescriptions by fraud, so that HealthRight and Scott Roix could sell those prescriptions to the SYNERGY PRINCIPALS, LARRY SMITH, Mihir Taneja, and others known to the grand jury during the term of the conspiracy.

97.     From on or about September 21, 2015 through on or about October 18, 2017, with Maikel Bolos' agreement and understanding, the SYNERGY PRINCIPALS, relying upon the TN Board of Pharmacy license obtained for SYNERGY based upon the fraudulent representations made to the TN Board of Pharmacy described above, mailed approximately 3,868 prescriptions from Florida to approximately 1,329 people in the State of Tennessee, including people in the Eastern District of Tennessee.

98.     On or after September 1, 2015, the SYNERGY PRINCIPALS, on behalf of SYNERGY, agreed to purchase prescriptions for Inflated AWP Medications from HealthRight for patients with prescription insurance coverage.  Initially, the SYNERGY PRINCIPALS agreed to split revenue obtained from the PBMs in furtherance of the conspiracy with HealthRight.

99.     Beginning on or after the early part of 2016, the SYNERGY PRINCIPALS, on behalf of SYNERGY, agreed to buy at least 2,600 prescriptions for Inflated AWP Medications

34

per month from HealthRight (for patients with prescription insurance coverage) in exchange for a payment to HealthRight of $300,000 per week, or approximately $500 per prescription.

100.    On or about October 6, 2016, the SYNERGY PRINCIPALS organized PRECISION in the State of Florida for the purpose of concealing the SYNERGY PRINCIPALS' ownership of, or economic or controlling interests in, various pharmacies located in Florida, Indiana, and Texas, so that those pharmacies could bill PBMs for prescriptions for Inflated AWP Medications purchased from HealthRight that SYNERGY could not bill.

101.    On or about October 10, 2016, the SYNERGY PRINCIPALS, on behalf of SYNERGY and PRECISION, agreed to purchase at least an additional 800 prescriptions for Inflated AWP Medications per month from HealthRight (for patients with prescription insurance coverage) in exchange for an additional payment to HealthRight of $95,000 per week, bringing the total to at least 3,400 prescriptions per month in exchange for a payment of $395,000 per week.  Thereafter, the SYNERGY PRINCIPALS sent many of these additional prescriptions to Maikel Bolos so that he could bill them through his PRECISION Pharmacy.

102.    From in or around August 2015 through at least in or around December 2017, Mihir Taneja, Arun Kapoor, and LARRY SMITH caused thousands of bottles of Durachol and Cifrazol to be mailed from Florida to destinations throughout the United States, including to the Eastern District of Tennessee, knowing the same to have been falsely and fraudulently packaged and labeled as prescription drugs.

103.    On or about January 9, 2017, Mihir Taneja and Arun Kapoor set the AWP of Cifrazol at $895.20 per thirty-count bottle, more than 1,000 times greater than their cost to acquire thirty Cifrazol capsules.

104.    From on or after September 2015 through the end of the conspiracy, the

35

SYNERGY PRINCIPALS in fact: (a) purchased tens of thousands of prescriptions for Inflated AWP Medications from HealthRight (for patients with prescription insurance coverage); (b) caused SYNERGY to bill most of those prescriptions to the PBMs and obtained approximately $77,835,482 as a result; (c) caused the PRECISION Pharmacies, including Maikel Bolos, to bill the remainder of those prescriptions to the PBMs, for which they received approximately $10,749,563 as a result; (d) caused Inflated AWP Medications to be mailed to patients throughout the United States including numerous patients in the Eastern District of Tennessee such as those listed in counts Two through Twenty-Three of this indictment; and (e) paid HealthRight kickbacks, directly and indirectly, amounting to approximately $31,935,752 for such prescriptions.

105. From on or about the fall of 2016 and thereafter during the conspiracy, LARRY SMITH and Mihir Taneja, on behalf of ALPHA-OMEGA, GERMAINE, and ZOETIC, agreed to purchase prescriptions for Inflated AWP Medications from HealthRight and Scott Roix (for patients with prescription insurance coverage).

106. Beginning with ALPHA-OMEGA's involvement in the conspiracy, LARRY SMITH used TANITH for the purpose of concealing his ownership of, or economic or controlling interests in, ALPHA-OMEGA, GERMAINE, and ZOETIC so that those pharmacies could continue to bill PBMs for prescriptions for Inflated AWP Medications purchased from HealthRight and Scott Roix.

107. From on or about October 2016 through the end of the conspiracy, LARRY SMITH and Mihir Taneja in fact: (a) purchased thousands of prescriptions for Inflated AWP Medications from HealthRight (for patients with prescription insurance coverage); (b) caused those prescriptions to be billed to the PBMs through ALPHA-OMEGA, GERMAINE, and

36

ZOETIC, and obtained approximately $24,919,254 as a result; (c) caused ALPHA-OMEGA, GERMAINE, and ZOETIC to mail those prescriptions to patients throughout the United States including patients in the Eastern District of Tennessee such as those listed in counts Twenty Four through Thirty; and (d) paid HealthRight kickbacks amounting to approximately $3,551,624 and caused ULD WHOLESALE to pay an additional approximately $1,615,113 to Scott Roix for such prescriptions.

108.    The SYNERGY PRINCIPALS laundered and attempted to launder not less than: (a) $70,080 through Global Patient Services LLC, from on or about November 17, 2015 through on or about September 8, 2016; (b) $120,670 through Affordable Medication Solutions LLC, from on or about December 5, 2016 through on or about January 5, 2018; and (c) not less than $87,159 through RxSolutions Inc., from on or about December 15, 2015 through on or about March 15, 2018, all for the purpose of defrauding the PBMs by making it appear as though SYNERGY and the PRECISION Pharmacies were collecting copays when in fact they routinely and systematically failed to do so.

109.    From on or about March 6, 2017 through on or about January 19, 2018, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ULD WHOLESALE, Mihir Taneja, and Arun Kapoor, laundered not less than $1,184,401 through AlphaScrip Inc. for the purpose of defrauding the PBMs by making it appear as though ALPHA-OMEGA, GERMAINE, and ZOETIC were collecting copays when in fact they routinely and systematically failed to do so.

110.    As a result of the conspiracy described in this Indictment, the SYNERGY PRINCIPALS, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, TANITH, ULD WHOLESALE, Sterling-Knight, Mihir Taneja, Arun Kapoor, and Maikel Bolos, together with HealthRight, Scott Roix and others known to the grand jury, caused

37

not less than $931,356,936 in fraudulent claims for payment to be submitted to the PBMs, for which the PBMs paid not less than $174,202,105 on behalf of Medicare, TRICARE, Medicaid, FECA, FEHBP, and the Private Carriers.

All in violation of 18 U.S.C. § 1349.

## HEALTH CARE FRAUD CONSPIRACY FORFEITURE ALLEGATIONS
### (18 U.S.C. § 981(a)(1)(C); 28 U.S.C § 2461)

111.    Paragraphs 1 through 33 and 36 through 110 are incorporated herein by reference and re-alleged as though fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) as incorporated by Title 28, United States Code, Section 2461.

112.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, upon conviction of an offense in violation of Title 18, United States Code, Section 1349, conspiracy to commit healthcare fraud, the defendants, ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, SYNERGY, PRECISION, LARRY SMITH, ALPHA-OMEGA, GERMAINE, ZOETIC, TANITH, ULD WHOLESALE, Sterling-Knight, Mihir Taneja, and Arun Kapoor, shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  The property to be forfeited includes, but is not limited to the following:

      (a)    **Money Judgment**

A personal money judgment in favor of the United States and against:

- defendant ANDREW ASSAD in the amount of $5,927,416;

- defendant PETER BOLOS in the amount of $3,203,414;

38

- defendant MICHAEL PALSO in the amount of $5,737,099;

- defendant LARRY SMITH in the amount of $1,532,928;

- defendant SYNERGY in the amount of $77,835,482;

- defendant PRECISION in the amount of $10,749,563;

- defendant ALPHA-OMEGA in the amount of $24,061,540;

- defendant GERMAINE in the amount of $1,438,246;

- defendant ZOETIC in the amount of $2,621,960;

- defendant TANITH in the amount of $1,797,377; and

- defendant ULD WHOLESALE in the amount of $19,401,680;

which represent the amount of proceeds each of these defendants personally obtained from the offense(s) described above.

If any of the property described above, as a result of any act or omission of the defendant:

(i)     cannot be located upon the exercise of due diligence,

(ii)    has been transferred or sold to, or deposited with, a third party,

(iii)   has been placed beyond the jurisdiction of the court,

(iv)    has been substantially diminished in value, or

(v)     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461.

### COUNTS TWO – TWENTY-THREE
### (Mail Fraud, 18 U.S.C. § 1341)

113.    Paragraphs 1 through 33 and 36 through 110 are incorporated herein by reference

39

and re-alleged as though fully set forth in the following counts.

114.     From on or about June 1, 2015, through on or about April 1, 2018, in the Eastern District of Tennessee, and elsewhere, the defendants, ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, and SYNERGY, with the intent to defraud, willfully participated in, with knowledge of its fraudulent nature, the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises; and, on or about the dates set forth in the chart below, in the Eastern District of Tennessee, for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive, the defendants, ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, and SYNERGY, knowingly caused to be deposited, sent, and delivered from Florida to the Eastern District of Tennessee by the United States Postal Service and any private and commercial interstate carrier, according to the direction thereon, Inflated AWP Medications, each row being a separate count of this indictment:

| Count | Date of Mailing | PBM | Dr. | Inflated AWP Medications Paid by PBM | Amount Paid | Patient (Location) |
|-------|-----------------|-----|-----|--------------------------------------|-------------|--------------------|
| (2) | 2/12/16 | ESI | J.L. | Lidocaine 5% Ointment, Vanatol LQ Oral Solution | $12,688 | T.R. (Maryville, TN) |
| (3) | 2/12/16 | ESI | J.L. | Lidocaine 5% Ointment, Vanatol LQ Oral Solution | $12,603 | T.R. (Elizabethton, TN) |
| (4) | 2/16/16 | ESI | J.L. | Lidocaine 5% Ointment | $7,412 | W.S. (Oak Ridge, TN) |
| (5) | 2/16/16 | ESI | J.L. | Lidocaine 5% Ointment | $8,150 | R.B. (Shelbyville, TN) |
| (6) | 2/22/16 | CVS | J.L. | Lidocaine Oin 5% | $7,252 | R.B. (Elizabethton, TN) |
| (7) | 3/1/16 | ESI | M.L. | Lidocaine 5% Ointment, Vanatol LQ Oral Solution | $4,267[1] | J.R. (Bulls Gap, TN) |
| (8) | 3/1/16 | CVS | M.L. | Lidocaine Oin 5% | $5,299 | T.S. (Shelbyville, TN) |
| (9) | 5/27/16 | ESI | J.L. | Lidocaine 5% Ointment Vanatol LQ Oral Solution | $9,281 | H.D. (Knoxville, TN) |

[1] After paying this amount, the PBM later reversed the payment.

40

| | | | | | | |
|---|---|---|---|---|---|---|
| (10) | 5/27/16 | ESI | J.L. | Lidocaine 5% Ointment Vanatol LQ Oral Solution | $12,710 | A.M. (Cowan, TN) |
| (11) | 5/27/16 | ESI | J.L. | Lidocaine 5% Ointment | $8,158 | C.H. (Knoxville, TN) |
| (12) | 6/9/16 | ESI | J.L. | Lidocaine 5% Ointment Vanatol LQ Oral Solution | $12,613 | A.K. (Whitwell, TN) |
| (13) | 6/9/16 | ESI | J.L. | Compound | $4,555 | T.D. (Signal Mtn., TN) |
| (14) | 6/14/16 | CVS | J.L. | Lidocaine Oin 5% | $7,851 | J.B. (Greeneville, TN) |
| (15) | 7/6/16 | CVS | J.L. | Lidocaine Oin 5%, Diclofenac Gel 3% | $10,950 | D.S. (Surgoinsville, TN) |
| (16) | 7/14/16 | ESI | W.H, M.L. | Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel | $10,532 | J.B. (Hixson, TN) |
| (17) | 7/15/16 | CVS | J.L. | Lidocaine Oin 5% | $7,961 | E.P. (Tullahoma, TN) |
| (18) | 7/18/16 | CVS | J.L. | Lidocaine Oin 5% | $1,995 | C.C-R. (Limestone, TN) |
| (19) | 7/20/16 | ESI | J.L. | Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel | $16,890 | J.F. (Seymour, TN) |
| (20) | 7/21/16 | CVS | J.L. | Lidocaine Oin 5%, Diclofenac Gel 3% | $18,538 | B.K. (Blountville, TN) |
| (21) | 8/16/16 | CVS | J.L. | Lidocaine Oin 5%, Diclofenac Gel 3% | $9,582 | A.M. (McDonald, TN) |
| (22) | 11/23/16 | ESI | M.L. | Lidocaine 5% Ointment | $6,113 | C.A. (Sevierville, TN) |
| (23) | 8/2/17 | ESI | R.C. | Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel | $3,010 | T.A. (Greenback, TN) |

Each count being in violation of 18 U.S.C. § 1341.


## COUNTS TWENTY-FOUR – THIRTY
### (Mail Fraud, 18 U.S.C. § 1341)

115.    Paragraphs 1 through 33 and 36 through 110 are incorporated herein by reference and re-alleged as though fully set forth in the following counts.

116.    From on or about June 1, 2015, through on or about April 1, 2018, in the Eastern District of Tennessee, and elsewhere, the defendants, LARRY SMITH and ALPHA-OMEGA, with the intent to defraud, willfully participated in, with knowledge of its fraudulent nature, the

41

above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises; and, on or about the dates set forth in the chart below, in the Eastern District of Tennessee, for the purpose of executing or attempting to execute the above-described scheme and artifice to defraud and deprive, the defendants, LARRY SMITH and ALPHA-OMEGA, knowingly caused to be deposited, sent, and delivered from Florida to the Eastern District of Tennessee by the United States Postal Service and any private and commercial interstate carrier, according to the direction thereon, Inflated AWP Medications, each row being a separate count of this indictment:

| Count | Date of Mailing | PBM | Dr. | Inflated AWP Medications Paid by PBM | Amount Paid | Patient (Location) |
|-------|-----------------|-----|-----|--------------------------------------|-------------|---------------------|
| (24) | 9/19/17 | CVS | M.L. | Diclofenac 3% Gel, Cifrazol Cap 1-3775 | $3,555 | B.N. (Knoxville, TN) |
| (25) | 9/27/17 | CVS | W.H. | Diclofenac Gel 3%, Lidocaine Oin 5%, Fenortho Cap 200 mg | $4,707 | R.W. (Jefferson City, TN) |
| (26) | 9/28/17 | CVS | W.H. | Lidocaine Oin 5% | $1,340 | P.L. (Dunlap, TN) |
| (27) | 9/28/17 | CVS | M.L. | Diclofenac 3% Gel, Fenortho Cap 200 mg | $5,440 | P.O. (Maryville, TN) |
| (28) | 10/13/17 | CVS | M.L. | Diclofenac Gel 3%, Lidocaine Oin 5%, Fenortho Cap 200mg | $9,434 | T.W. (Winchester, TN) |
| (29) | 11/13/17 | MIP | R.C. | Durachol 3,775-1mg cap | $823 | V.M. (Chattanooga, TN) |
| (30) | 11/20/17 | MIP | M.L. | Durachol 3,775-1mg cap | $1,058 | L.B. (Knoxville, TN) |

Each count being in violation of 18 U.S.C. § 1341.


## COUNT THIRTY-ONE
### (Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Defraud and Mislead, 21 U.S.C. §§ 331(a), 353(b)(1), 333(a)(2))

117. Paragraphs 1 through 33 and 36 through 110 are incorporated herein by reference

and re-alleged as though fully set forth in the following count.

118.    On or about February 26, 2016, in the Eastern District of Tennessee and elsewhere, the defendants ANDREW ASSAD, PETER BOLOS, MICHAEL PALSO, and SYNERGY, with the intent to defraud and mislead, introduced, delivered, and caused to be introduced and delivered, into interstate commerce from Florida to the Eastern District of Tennessee, Lidocaine 5% Ointment, a prescription drug that was misbranded for being dispensed to patient W.S. without a valid prescription of a practitioner licensed by law to administer such drug and contrary to the provisions of 21 U.S.C. § 353(b)(1), all in violation of 21 U.S.C. §§ 331(a), 353(b)(1), and 333(a)(2).

## COUNT THIRTY-TWO
### (Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Defraud and Mislead, 21 U.S.C. §§ 331(a), 352(a)(1), 353(b)(1), 333(a)(2))

119.    Paragraphs 1 through 33 and 36 through 110 are incorporated herein by reference and re-alleged as though fully set forth in the following count.

120.    On or about September 19, 2017, in the Eastern District of Tennessee and elsewhere, the defendants LARRY SMITH and ALPHA-OMEGA, with the intent to defraud and mislead, introduced, delivered, and caused to be introduced and delivered, into interstate commerce from Florida to patient B.N. in the Eastern District of Tennessee, Cifrazol 3,775-1mg cap (69336-0310-30), a drug that was misbranded in that its labeling was false and misleading in any particular and was dispensed to patient B.N. without a valid prescription of a practitioner licensed by law to administer such drug, all in violation of 21 U.S.C. §§ 331(a), 352(a)(1), 353(b)(1), and 333(a)(2).

43

\* \* \* \* \*

A True Bill:

███████████████████████████

Foreperson

Approved:

J. Douglas Overbey
United States Attorney

By: _____
Timothy C. Harker
Assistant United States Attorney

By: _____
Mac D. Heavener
Assistant United States Attorney

By: _____
David L. Gunn
Trial Attorney
United States Department of Justice
Consumer Protection Branch

44